Illinois Appellate Court, First District Court is now in session. The First Division, Justice John Griffin presiding. Case number 1-7-0-7-8-6, People v. Christopher Waymer. Well good afternoon, welcome. Would the attorneys who are going to argue please state your name and spell your last name? Jessica Ware on behalf of the Office of the State Appellate Defender. Last name W-A-R-E, Ware. Thanks. Good afternoon, Assistant State's Attorney Brian Levitsky, L-E-V as in Victor, I-T-S-K-Y as in yellow. I'm arguing on behalf of the people of the state of Illinois. Okay, well as you both know you each get 20 minutes. Does the appellant want to reserve any time? For rebuttal, yes please. Five minutes please. Yes. Great. All right, thank you. We can we can start. Thank you. May it please the court, my name is Jessica Ware on behalf of the Office of the State Appellate Defender and I represent the appellant Mr. Christopher Waymer. Your honors, today I'd like to argue issues one and two from my brief. The trial court aired when it failed to suppress Christopher Waymer's pre and post Miranda statements from October 9th, 2011 because Waymer was subjected to custodial interrogation and because the detectives withheld Miranda warnings until after Waymer made an incriminating statement in violation of Missouri v. Siebert. With regard to Waymer's pre-Miranda statement on October the 9th, the issue here is whether Waymer was in custody during the interrogation and the answer here is yes. A reasonable juvenile in Waymer's circumstances would not have felt as if he were free to terminate the interrogation and leave the police station. Excuse me, are you saying he was in custody then on, was it September 11th and 12th also? No. October 9th, 2011 is when he was in custody. The interrogation on October the 9th, 2011 was very different from the on September 11th, 12th, and 13th. On October 9th particularly is when the officers had a break in the case. They discovered new cell phone evidence and they testified that they wanted to confront Waymer with that evidence and so this interrogation on October 9th is when the investigation shifted and among the several enumerated factors that the court has said is relevant to the question of whether an individual is in custody, all of those factors except one weigh in favor of Mr. Waymer having been in custody at the time of that statement and the first one is his age, intelligence, and mental makeup of the defendant. In this case, Mr. Waymer was a 17-year-old who'd never been arrested, never been accused of a crime before, no criminal record at all and the location, time, length, mood, and mode of questioning, all of those weigh in favor of him having been in custody as well because the location of the interrogation was not at his house, it was not out on the street, it was in a closed interrogation room with two armed officers and he could not leave out of that room unescorted and by the officer's own testimony of the motion to suppress hearing, the mode of questioning was confrontational. Detective Haddari admitted that the purpose of the interrogation on October 9th was to confront Waymer with the inconsistencies in his prior statements. Now, the inconsistencies that they wanted to confront Waymer with were damning. The evidence that they had, the officer testified it constituted a break in the case. This new cell phone evidence showed, number one, that Waymer had been lying about his whereabouts on the night of the murders and number two, it showed that he was in the location of the murders at the time that they were committed and not only that, it placed him with John Granat, the main suspect who had already been arrested for the murders. So it placed them together during the time of the murders and afterwards by Waymer's house. So the number of officers, the number of officers who were in the room, that also weighs in favor. There were two officers to Waymer's one person. Waymer was there without friends or family. He was reliant on the police to take him home. He had been brought there by, escorted by the police and the manner in which he arrived at the station, all that weighs in favor and also the last factor was whether he was allowed to walk from the interrogation room and he was not. The officers testified he was not free to walk to leave that, to leave that room even though the door was unlocked. And so at what point, at what point do you believe, are you arguing that he became a suspect? Was it that morning when they already had the evidence or was it after the drawing? Right. Waymer became a suspect when the police went to get him to question him. When they got the evidence, placing Waymer at the scene of the murders at the time of the murders with the main suspects, the officers at that point, Waymer was, became a suspect, not after the drawing. So you're arguing when he was picked up at his house that morning he was a suspect? Correct. Correct. Yes. The facts of this case are strikingly similar to People v. Clayton. In that case, this court held that a reasonable person in Clayton's position would not have felt free to leave the police station given that the defendant was 17 years old, lived at home with her parents, was taken to the police station alone and held in an interrogation room for over five hours before she was Mirandized and not told that she was free to leave. Okay, can I ask you two things though? One, he was only there an hour, right, before he drew the picture, drew the diagram? No, no. He was there for going on four hours before he was, before he drew the picture. He arrived at, well, okay, so he arrived at the station at 11 and he supposedly drew the picture at around 1 37. So he was there for over... Okay, I know there were two interviews. They interviewed him at 11 o'clock, they interviewed him at 12 o'clock, and during that time they were going back and forth between his interrogation and Qasem's interrogation, who was the other co-defendant, who was also being interrogated. And Qasem testified that during his interrogation, when the police were confronting him with his lies, he began to give it up and he began to incriminate Wyma. So no doubt the officers are going back and forth between rooms, confronting them with inconsistencies in their statements. No 17-year-old child being confronted with their lies, incriminating lies, by police officers would feel free to stop the interrogation and leave. And that is exactly what this court held in Clayton. And as I stated, the facts of that case are strikingly similar to this case. The state argues in its brief that because Wyma voluntarily went to the station on those prior dates, that he was not in custody on October 9th. But the Supreme Court in People v. Lopez held that voluntary presence at the police station can escalate into custodial interrogation. So even if he was voluntarily present on the night, even if he went to the station voluntarily that day, once they begin to interrogate him and confront him with his lies that he's been telling, it escalated into a custodial interrogation. And that is what the Supreme Court recognizes. There's no argument that this escalated into a custodial because then they gave him a Miranda right. Correct, but it was a custodial interrogation prior to those Miranda warnings, is my argument. Because the officers were confronting him with his lies and because of all the factors that the court has said is relevant to this inquiry, they basically all weigh in favor of him having been in custody, especially given his age as a 17-year-old child. He's not going to feel like he can leave the station under these circumstances. The state also points to the fact that while, I'm sorry, are they confronting him with his lies or are they trying to I mean, aren't the police officers entitled to, hey, this guy tells me one thing, the other guy told me another thing. Who knows what's right? Let me go back and ask Wyma what's up. So, you know, you can cast it as interrogation, but it may have been a continuation of the investigation that they had been through a couple times before with this man who voluntarily went around the police station. Well, Kossum testified that they were confronting him with his lies when he was in his room. And we have to take this from the standpoint of a 17-year-old child because the standard is what would a reasonable person in that circumstance feel? Regardless of what the officer said, he was a suspect or he wasn't a suspect, the question is what would a reasonable 17-year-old feel from those circumstances? And as I stated before, Kossum said that that's exactly what they were doing, is they were confronting him with his lies. And your honors, the state also points to the fact that because Wyma's father was a police officer, that that would have made him feel less intimidated or less pressured by the situation. But what the state fails to address is the fact that Wyma's father was a tyrant. He was abusive towards Wyma. They did not have a good relationship. And so the fact that he's in the room with these officers and his father is a police officer, if anything, that would have just added to the intimidation and the coercive pressures and the feeling as if I have to go along with him. I can't stop talking. I have to keep talking. Now, is that somewhere in the record that he felt that way? That he felt what way? I'm sorry. What you just described, that he was transposing his feelings for his dad to these officers? No, it's not. But the state made the argument that because his father was a police officer that we can somehow infer that he would have been comfortable in the setting. So that's my response to that. Your honor, we should disregard your comments about his father being abusive because it's not in the record. Oh, that's in the record. It's in the it's in the record. It's in the mitigation report. It's in the sentencing hearing. It's in the record. Yes. But it was not brought out at the motion to suppress. Correct. It was not brought out at the motion to suppress. Your honors, I'd like to move on to the to the Siebert argument if you all have no further questions about the custody. Your honors, why was Post Miranda's statement on October 9th should have been suppressed? Because they were the product of a question first, warn later interrogation tactic condemned in Missouri versus Siebert. The detectives in this case mirandized Weimer only after he incriminated himself by placing himself in John and Maria's bedroom on the night of the murders. Although detective Hadari did not admit that the detectives deliberately used this two-step interrogation procedure, the circumstances surrounding the interrogation indicate otherwise. Given the incriminating evidence that the detectives were armed with, it defies logic to believe that Weimer was not a suspect when they brought him to the station on October 9th. The detective admitted that he was going back and forth between Kasson's room and Weimer's room, no doubt collecting inconsistencies and confronting them. The detectives should have known that Weimer would be moved to incriminate himself in response to this back and forth questioning, especially here when the detectives did not accept Weimer's innocent explanation for why his phone was near the murders, and the detectives continued to press him until he incriminated himself and said, yes, I was there at the Granotte residence. The other factors that are relevant to this inquiry also support that the officer's conduct was deliberate here, like the continuity of police personnel, the timing, location, and overlap of the contents of the statement. Here, it was the same officers in the pre-Miranda statement as it was in the post-Miranda statement, with only a 30-minute break in between. They kept him in the same room. They repeated the same facts that they procured from the pre-Miranda statement. They started off the post-Miranda statement repeating those same facts and telling him to continue on. So this was all part of a, like a continuum, and what is telling here in terms of deliberateness is the point where police claim he became a suspect, you know, when he drew this drawing. They never told him that you're under arrest. They never placed him under arrest. They never stated you're not free to leave at this point. You know, they just kept it going as a continuum. A 17-year-old in that situation would not understand the shift in the investigation, that this is a totally different context, that you don't have to speak. They created a situation where it would be unnatural for a 17-year-old to continue talking. In fact, when the detective resumed the back into it, I gotta read you your rights, and he read the rights, and he said, okay, now continue on. And so in that situation, there's no substantial break, and that is what Siebert looks for. There's no substantial break to where the defendant can distinguish the two contexts. This was all part of a continuum, and the state in this brief does not address or dispute the fact that the officers did not employ curative measures in this case, your honor. So if this court finds that the officers deliberately used a question-first-warned-later tactic, it should also find that there were no curative measures taken because the state did not address this or contest this at all in its brief, and probably because all of the factors, all of the enumerated factors that the Supreme Court said is relevant to this inquiry show that there was no curative measures. One of the factors is very little time passing in between the two statements. Lopez says that two hours passing was not, was a short period of time. In this case, we only have 30 minutes, a 30-minute gap. The two statements were taken in the same room, same detective. The details of the unwarned statement were used to procure the new statement. Also, it would have been unreasonable for Wima to regard the session, it would have been reasonable, I'm sorry, for him to regard the session as a continuum. Your honor, the state also has not carried this burden to show that this error is harmless beyond a reasonable doubt. Our Supreme Court has stated that a confession is the most powerful piece of evidence the state can introduce, and its effect on the trial of facts is incalculable. In this case, it would be different. We do have eyewitnesses here, right? The only eyewitness that testified at who the jury would have been instructed to take that testimony with caution and suspicion because he's getting a deal for his testimony. So beside the confession, the state's strongest piece of evidence was accomplished testimony. And who knows how much weight the jury would have given that testimony after they were instructed, hey, regard that testimony with caution and suspicion, this guy got a deal for his testimony. But Wima's statement, on the other hand, was compelling. His statement was recorded, it's on video, it's, you know, dramatic and all of that. So there's no way that this confession was not critical to the state's case and their conviction. And in fact, the prosecutor at trial relied on that confession 11 times in closing arguments. They played clips from the video of the interrogation six times. In closing, that was the last thing the jury was left with. So to argue now on appeal that the statement was not critical to the conviction, it just does not add up. So for these reasons, I ask that the court would reverse and remand for a new trial on issue one. And also I'd like to touch on issue two of my briefs, your honor. You're pretty much out of time, but if you want to briefly mention it, go ahead. Okay, I'll briefly mention it, your honors. Christopher Wima's natural life sentences were an abuse of discretion because there was substantial mitigating evidence showing that Wima had rehabilitative potential. He had no criminal record. He'd never done anything in prison during his five year incarceration. He was working on his GED. This offense had the markings of peer pressure all over it. Wima had been groomed by Granotte. He had been lured into this by Granotte. That is one of the hallmarks of youth, is being influenced by negative influences and peer pressure. Wima showed remorse at sentencing, even against the advice of counsel not to speak at sentencing. He chose to apologize to the victims and he did not downplay his conduct. He said it was horrible and he was very remorseful. And Wima had a lot of mitigating evidence in his background as well as illustrated in the briefs about his abuse and different things like that. And as explained in the briefs, the court one by one tried to discount and discredit all of the mitigating evidence so that it can conclude that Wima was incorrigible. But in this case, the court's focus on the brutal nature of the offense was misplaced because Roper tells us that in the juvenile context, the brutal and heinousness of a crime does not trump age. I'm sorry, Roper held that because juveniles are still struggling to find their identity, it is less supportable to conclude that even a heinous crime committed by a juvenile is evidence of irretrievable depraved character. So in this case, the judge's reliance on the brutal nature of the crime to give him a life sentence was misplaced. And I also ask in the alternative that this court will find an abuse of discretion at sentencing and reverse and remand for new sentencing hearing as well. Thank you. Oh, go ahead. Carol, you're muted. Can you hear me? Wait, no, Justice Walker's talking, but yeah. Counsel, counsel for the appellate? Miss Ware? Yes. Just had a question for you. The state argues that the most important sentencing factor is the nature of the seriousness of the crime, and there are appellate court decisions to say that there are no Supreme Court, Illinois Supreme Court decisions that make that statement, but I've seen that in several appellate court decisions. What's your position regarding that? What's your arguments? Yes, that's within the adult context. In the adult context, the case law says that the seriousness of the crime is the most important factor. The state did not cite any case that says in the juvenile context that is so, and that is because of the U.S. Supreme Court decisions that have come down, Miller, Roper, and Graham, that says that brutal and heinous does not trump the young age of the defendant. And the quote that I read to you from Roper that said even a heinous crime committed by a juvenile is less supportable that that's evidence of encourageability. And so in the context of juveniles, that case law is misplaced because of the United States Supreme Court jurisprudence on juvenile sentencing. Thank you. What about the Illinois Supreme Court's decision in Holman? Yes, so all of those decisions follow Miller, Graham, and Roper. They are flowing from those decisions, and those cases have not diverted from that. Those cases have cited the case law that I'm speaking of, the United States Supreme Court case law, and those cases show that that factor, the brutal nature of a crime, does not trump a defendant's age. And the reason is, is because there are certain things about a youth that makes them rehabbable. Let me just say it that way. It's because of their lack of maturity. It's because they're more susceptible to negative influence and peer pressure, and their character is not well-formed. And those factors make them less responsible for their conduct, even when it's brutal and heinous. It's not as morally reprehensible as an adult, and that's what the case law says. That's what Holman follows, and all of the Illinois Supreme Court cases as well. They have not deviated from that. Okay, thank you. Mr. Levitsky? Yes, again, good afternoon. Assistant State's Attorney Brian Levitsky on behalf of the people of the state of Illinois. I'll follow the issues in the same format that counsel did, in case, unless this court wants to skip ahead to the second issues, I'll just start with the first. As this court is well aware, Miranda is not required in cases simply because questioning happens at a station house, or because questioning is involved, or even because the individual who is being questioned may become a suspect. And they certainly weren't required in the morning sessions of October 9th of 2011 here, where from the defendant's perspective, he was going to the station house, as he had before, to speak to the investigating detectives for their investigation against another person. In other words, from defendant's perspective, based on what he knew, he was giving them false information. To put it differently, again, he wasn't simply there voluntarily, he was there purposefully, to evade detection for his own participation in this crime. At what point are you arguing that Miranda is required? I understand you start your argument off with that, under certain circumstances, it's not required. So at what point is it required where a juvenile is being questioned? So it's always been the case that custodial interrogation is the point where Miranda rights are required. And when we're looking at custodial interrogation, we do take into account the fact that an individual is a juvenile. And then, based in that framework, we ask what were all the circumstances that this individual was in. And we look at it objectively, and we ask whether or not the circumstances were such that the individual was so recourse that they did not feel that they would have been free to terminate the conversation. And in this case, again, the events of October 9th were preceded by three instances where this defendant went to speak with the police or the prosecutors, testified before the grand jury, made a videotaped statement. After each of these occasions, he left and went home. Also, we know from Detective Haidari's testimony, which the trial court specifically found credible, that the defendant wasn't handcuffed, that the officers were in plain clothes, unmarked car, when they brought him, and the officers did provide transportation to the station house, but also provided transportation back. We also know that his mother gave permission for him to go, at least on the first day. And now you're arguing things that those aren't the issues right now. Counsel is arguing that the problem was October 9th. So let's discuss October 9th. He was escorted to the station by police. He, counsel was arguing that he was not free to leave because they had evidence at that point that he was in fact involved in a crime. They had the cell phone evidence. They also at that point had testimony from a co-defendant. So, or at least evidence from a co-defendant that he, that Wyma was involved in the crime. So, and we're talking about someone who's 17 years of age. So we, we're, we've got the location is at the police station. He's not being questioned at his home. So the, the mode of question is that at this point, they're asking him questions after they go and talk to the other co-defendant, they're coming back, confirming things with him. So he was clearly a suspect at that point. There were two officers questioning him, at least two. And would he have felt free to leave at 17 years of age? Those are the, those are the inquiries that, that, that's, that, that the trial court should have made and that this court will make. So I think there's a few premises there that we need to talk about first. What the police obtained, according to the trial testimony on October 5th, was historical cell site location information, which showed that the cell phone was at Grenad's house at the time that Wyma said that he was at home. So as this court has, I'm sure, looked at several cases involving historical cell site location analysis. The question is always, can you tie the person to the phone? Because all you know from the analysis is that the phone was in a location at the time. So I think that it wasn't, as counsel says, damning evidence. It was a new question in the investigation, as Justice Pierce alluded to earlier, a question that they wanted to answer because from what they knew, even on October 9th, Wyma was still a suspect at Grenad's alibi. And therefore, this case is different from those cases you're referring to with the cell towers. Generally, that's information coming from a cell tower. And you don't know if that's a phone that's in the person's name who's being used by another family member or friend. But in this case, it was clear that that was Wyma's phone because Wyma actually gave the police the phone, allowed them to, to, to, to, to search his phone and to use his phone and to get evidence from his phone. So there was no issue about whose phone this was. So that's a little different from the cases you're referring to. If I may push back a little bit, I think that we certainly know that it was his phone. That's, and I agree with you, the evidence does show that he gave consent as well as I believe it may have been mentioned in another case that there was a court order for it. But I mean, the, the investigators could still wonder, okay, was this his phone, but he left it in someone else's car? Because we all know that these people were friends that were hanging out with each other. So I think that it, you know, good police work is still going to try to tie up some of these loose ends. We know it was his phone. Was he carrying the phone at the time? I think that's, that's the question that the police still had. And it would have been a foundational or a relevancy issue if it wasn't tied up at trial. So I do think that there was still some police work that needed to be done to investigate that new lead that they had and to continue the investigation and determine, again, just as Pierce alluded to earlier, who's telling the truth here? Is it, is it Granat who said that he was with Wyma the night of the offense? Is it Wyma who's saying that he was home with Kassem? Or is it Wyma later who says eventually at the 11 o'clock, yeah, I was there after they showed that the phone had been in the location for an hour. But Granat had still been the person who killed his parents and I simply went into the house. And so I think at that point, I mean, what we're seeing here is a investigation that's building. We have the accumulation of probable cause against this defendant who is in this transitional period between being an invest, a helpful witness for the investigation into another suspect in his own right. And that's why I think that the trial court credited Detective Haidari's testimony that they didn't really consider this defendant really a suspect himself until after he drew the diagram that showed that he was in fact inside the the room and that he knew information that would only be known by someone who had committed the offense and had been there. I think before that, he had already stated that he was there. He stated that he was there but actually the son killed the parents. Correct. That's what he said at the 11 o'clock. After initially saying that he was only there briefly for, I think it was called a blunt run or something like that. So they had the info, they had the cell phone information, they also had his statement that he was there. At that point, shouldn't they have given him a random warnings? I don't think that the circumstances have changed that much. I think that what we have here is again, you know, the defendant's giving more the same lies that he had before. He's still trying to thwart the investigation. I think that he was still there voluntarily because he wanted to give the police that sort of information and I think he did so not because they were confronting him with, you know, and that's the word that Detective Haidari used, that they were confronting him. But I think from, you know, the perspective of someone in his position who had been working there before, it's, you know, I'm going to help you tie up these loose ends and in doing so I'm going to show that I'm not a suspect in this case. So again, I think the defendant's presence there was purposeful in addition to being voluntary. So given all of your arguments, does this change at all given that this is a juvenile? You would say, your argument would be it doesn't matter whether he's a juvenile or an adult, is that correct? So I disagree with that. I don't think that it doesn't matter that he's a juvenile. Oh no, excuse me, there's nothing for you to disagree with. I simply ask you a question, you disagree with me asking you the question? Because you're saying you disagree, what do you disagree with? I didn't, I'm asking you a question, I didn't say what you think or what you don't think I'm asking you. Is there a difference? I apologize, I misunderstood. You disagree, you're going somewhere else. It's nothing to disagree with, it's a question to you. It's absolutely relevant to you as a juvenile. Okay, so that's the question, yeah, so you're answering the question. Now this simple thing about you disagreeing, that has nothing to do with my question. I apologize that I misunderstood the question. I think it's relevant, sorry, I think it's relevant certainly, the case law says that, but the fact that you have indicia of something that suggests coercion doesn't, you know, necessarily tip the balance by itself, any more than the fact that it's a station house or that they're asking questions or that it involves a person who's a suspect, because this is a person, again, who, I mean, he dealt, he, for a 17-year-old, demonstrated some sophistication. He'd spoken with the detectives before, again, I know we're talking about October 9th, but someone who had been working with the police before, fed them this information, apparently was able to convince them that it was reliable enough to get him in front of a grand jury and to make a videotaped statement, I mean, this is a sophisticated 17-year-old, and we also know that from the trial evidence that showed that he was someone who was, you know, really the second in command here, so it's relevant, but I don't think that it's, you know, such a material factor in this case that it really tips the balance against the standard of review here, which is manifest weight of the evidence. I think that the trial court could have found, certainly, that the defense presence there was voluntary, and therefore the Miranda warnings were not required, at least in the morning of October 9th. But if there are no further questions on that, I'd like to just sort of briefly transition into the Siebert issue. We didn't make an argument that there was, that there were curative measures here. I don't think the record really would support that argument, in good faith, for the reasons that counsel mentioned. This was, I mean, they stepped out briefly, turned the cameras on, came in, gave Miranda warnings, and then asked to recap the events. So I think that shows, does show that there is continuity, but the overall circumstances of this case don't show, nevertheless, there was deliberate, that there was a deliberate tactic that was employed. Again, I think that what Detective Haidari credibly testified to is found by the trial court was that this is a case where you had a building investigation, that new eventually defendant transformed from somebody who was thought to be a cooperating witness into a suspect, and the police did what was appropriate in that case, which was to make sure that any further statements would be Mirandized. And again, the, if we look at the statements that he made before Miranda and after, they're actually quite a bit different, because the defendant doesn't eventually admit to more participation, but before he's saying that it was a grat who actually killed them when, in fact, he had killed them himself, which I think shows that the police didn't get the most damning information that they could. Anything that would actually show that he was, he was present in the room, but not a participant of the offense before giving Miranda, I think they did the opposite. And to the extent that he was there before giving Miranda, I think that, again, what the police were doing in this voluntary presence there before giving Miranda, I think a point that they did which was appropriate. I'm not hearing any questions on this, so I just want to mention our harmless error argument. I think that, as you know, as counsel stated, case laws replete with, you know, this idea that confession is the most damning piece of evidence, and that its effect on the jury can be incalculable, and the defendant is correct. We did play portions of the statement to the jury, and in any other case, I think, you know, we would, we would look to that evidence, but if there is a case where the evidence against the defendant was such that even admitting his confession was harmless beyond a reasonable doubt, I think that it's present in this case. I mean, we had the testimony of Kassem, who counsel points out was a cooperating witness, who was, you know, his deal was before the jury, and it was an exchange for his truthful testimony. And he provided a very detailed narrative of the events leading, you know, up to the event. He told us who these people were, he told us how a defendant was the second in command who was planning this, how his house was basically the staging area for all the events of what happened at the Granats' house. He gave us all the information about what happened before, during, and then after, how all the, how all the evidence was how he was the one who actually selected the weapons, how he went to the house, how it was his computer that was used to communicate the code word. And although, you know, I understand, you know, counsel's concern is that as a cooperating witness, he's just inherently suspect, but everything he said was corroborated. Stephanie Wydra heard, you know, this group of people saying, you know, it's going to happen tonight, it's on, right before this, you know, horrific event happens. What happens afterward, defendant gives her this bloody shirt. She doesn't know what it's about, but it's tested, and they found out that John Granat Sr.'s blood is on it. That means he's not just present at the room. He must have been there when it happened for that blood splatter to get onto his shirt. He's also got this guitar bag that's full of cash afterwards. Certainly unusual for a 17-year-old to have that amount of money that he's then trying to get rid of, that he gives to Stephanie. And he also makes the statement he can't get their screams out of his head. We also have the computer records themselves that show that the Skype calls went back and forth between defendant and Granat. We also have, again, these phone records for what they're worth showing that a cell phone was in that location, and we have evidence that there was a material that was burned in this fire pit. So all of this shows that Kassam was absolutely telling the truth and provided all the details of this case, showing that a defendant was not just a, you know, a knowing person who was involved, but he was in fact directing a lot of the action himself, and he was at the very least a second in command for John Granat's master plan. Not hearing any questions, I'll just briefly address Miller before my time runs out. Again, just like the first issue, this is a case where, you know, there's mitigation evidence in the record to be sure, but that doesn't by itself show that the court reached the wrong conclusion. Just like there was indicia of a course of atmosphere, but that didn't show that there was a Miranda violation. Finally here was involved in the planning. From the beginning, we have all this evidence that shows that he was making some decisions by himself, like what weapon to use. His house was used, as I mentioned earlier, kind of as a staging area, and he himself participated in the murder, and then helped to destroy evidence afterwards. And then we know from, you know, issue one in this case that this defendant took serious steps to ensure that the investigation afterwards would be thwarted. So I don't think there's any question here, and I don't think that the argument's really being made that this wasn't a brutal and heinous crime. The question that's, I think, really before this court right now is, you know, what do we do with all this evidence of mitigation? It shows that he was a juvenile who was capable of reform, and I think that what happens is we have to weigh that evidence that was presented at the sentencing hearing, including all the information about the defendant's father that was presented in the mitigation report, as well as the testimony of the siblings and the mother about how he wanted to use the money to, you know, to help her escape this abusive situation. The abuse was physical, mental, and emotional. Again, that's all certainly relevant mitigation evidence that was before the court, but also before the court was evidence that, you know, before all this happened in the trial, you know, when they were going on these shopping sprees, the defendant was talking about living like a king with all this money. When Qasem said he didn't want to go through with it, one was the one who slapped him on the back and said, are you ready to live like a king? And then, you know, when after this horrific crime is over, when they're at a defendant's house afterwards, dividing up the money, you know, Granat says he's kind of feeling all right. Wyma says, you know, fuck that, they deserved it. And then after what they're dividing up the money, and this is, I believe, according to both Qasem and in defendant's videotape statement, he says the defendant took, you know, some money, and then it was Granat who actually said, you should take some for your mother. So I think what we have here is evidence that cuts both ways, and it was for the trial court in this case to weigh those factors and determine whether or not, you know, this really showed someone who was, you know, irreparably corrupt as the court found, or if it was someone who was capable of being rehabilitated and therefore was undeserving under Miller and Montgomery and all his progeny of a natural life sentence. And I think that, you know, with the evidence that's in this court, I'm sorry, that's in this record, you know, we might say that reasonable minds could disagree about how the court should have weighed it, but it wasn't an error for the court to weigh in the way it did. One thing I wanted to mention because it was brought up is we didn't have, I don't believe we have a juvenile case that talks about the seriousness of the offense always being, you know, the most important factor for sentencing. And I think that the way that, I think, you know, we analyze these after Miller is that we say that the court has to additionally consider, you know, factors like was there, is, you know, is this a rare juvenile offender who's displaying permanent cortability and also chronological age and all the attenuating factors that are associated with age. But after those considerations are made, then it still gets into this question of, you know, looking at all the circumstances and isn't the most important factor. It certainly still is a mitigating factor. It still is an aggravating factor in this case. Certainly, I think that any case where someone is going to be subjected to a natural life sentence is going to be a very serious case. And I think you do see these, you know, these horrific fact patterns are represented in this case law. And one thing that I think was also brought up earlier that I just wanted to briefly mention, Justice Pierce, you mentioned people versus Holman. And that's a case where, again, you had a defendant who was convicted of serious offenses. And there was also a mitigation report in that case, if I recall, as it was an older case. And I want to say, I'm sorry I don't recall this, I think it may have been a death penalty mitigation report. So a very thorough mitigation report that was presented. Which is all just to say that the fact that mitigation evidence is in the record doesn't by itself show that the court must necessarily find that that mitigation record takes a natural life sentence off the table, considering all the evidence together. Okay, time is up. No one has anything else. Thank you very much. Counsel? Thank you. Thank you. Just a couple of things I want to Your Honor, with regard to the interrogation on October 9th, that interrogation was different, again, from all other interviews, because that is when the investigation shifted towards Wyma. The state argues that the police just wanted to clarify certain facts. They could have clarified those facts while he was at home, or out on the street, or by calling him on the phone. But they whisked him away to an interrogation room away from his family, away from his friends. And Miranda, what that does, Miranda recognizes that whisking someone off the street and putting them in an interrogation room, that that preys on their vulnerabilities. And that is exactly what happened here. Even if his presence was voluntary, initially. Your Honor, again, I just want to reiterate that the focus on whether or not Mr. Wyma was in custody should be on the defendant, how a reasonable 17-year-old would feel under those circumstances. Regardless of what the officers testified, whether he was a suspect or not, the question is how would a reasonable 17-year-old with no criminal history, how would they feel under those circumstances? Your Honors, the state concedes that the factors show that there were no curative measures taken. But I like to explain to the Court that the factors that show deliberateness, if you look at Lopez, the factors that are used to determine whether the officer's conduct was deliberate or not are virtually the same as the curative measures factors. So if the state is conceding that no curative measures were taken, it is also kind of conceding that there's evidence of deliberateness here because those factors are virtually the same as espoused by the Supreme Court in People v. Lopez. Time, location, continuity of the facts, those factors that go to show deliberateness also go to show no curative measures were taken. Also, I want to mention that Miller, Graham, and Roper, all those cases, start with the presumption that a child has rehabilitative potential by virtue of them being a juvenile. They are not matured yet, their brain is not formed yet. We start with the presumption that Wyma had rehab potential. And then we work from there. The state conceded that there was mitigating evidence. There was rehabilitative evidence. He was getting his GED, but the judge downplayed that. The only mention of his educational pursuits by the judge was he's been in jail for five years and still hasn't got his GED. Wyma had no prior convictions, but the judge dismissed that basically and said, but there's evidence that he sold drugs, that he sold marijuana. Well, I mean, he still didn't have any prior criminal history, and the evidence was that he was selling marijuana to support his own drug habit, which is also a mitigating factor. But the court here went out of its way to discount anything mitigating, anything showing rehabilitative potential. Also, I want to mention that the brutal nature of this crime is also partly because these were amateurs who had no idea what they're doing. Initially, Granat said, I need a grenade launcher, a bulletproof vest, and a machine gun. And when they couldn't get that, Wyma looks under his porch and says, hey, let's use these bats. I mean, these were kids who had no idea what they're doing, and that's part of the reason why this was so brutal and heinous. And I also want to to mention, finally, that the judge is finding that the only peer pressure here was the peer pressure, and I'm quoting, the peer pressure that he put on the other co-defendants. That is totally incorrect, Your Honor. Even Kossum testified that Granat would give Wyma an allowance like he was a child. Granat groomed Wyma. He gave him money. He gave him hope for a job, and this was a poor kid who needed money. And so by the time that Granat decides he wants to kill his parents, Wyma's on board with it. By the time Granat says, it has to happen tonight, Wyma's on board with it. He calls Kossum and Salahat and says, it has to happen tonight. When Granat says, I need a machine gun and a grenade launcher, what does Wyma do? He goes and tells the others, we need a machine gun and a grenade launcher. When Wyma goes upstairs in the bedroom to do the killing, and then they chicken out and run back downstairs because their backs clank together, what does Granat say? Go back upstairs. Wyma goes back upstairs. Wyma is taking his cues from Granat. The idea that there was no negative influence from Granat is totally against the record, and peer pressure and negative influence is one of the hallmarks of youth here, Your Honor. So in order to find that these natural life sentences were proper, this court would have to believe that there is no rehabilitative potential, nothing showing here that he can be rehabilitated. And in this case, there's tons of rehabilitative potential shown for the reasons explained in the record. And also, Your Honor, I'd just like to mention that during his incarceration, there was no evidence that he's ever done anything since this murder. And so this murder was an aberration, and it is not likely to happen again. The state did put forth any evidence that he had some kind of psychotic permanent condition to where he can never be changed. He's always going to be violent. None of that. They didn't do any kind of assessments or anything showing that this was a condition that he could not outgrow. And that's where we have to start with the idea that Miller, Graham, and Roper say that that children grow up, that they are not fixed just yet. And so, Your Honor, for these reasons and the reasons explained in the briefs, I'd ask this court to reverse and remand for a new trial or any alternative to remand for a new sentencing hearing. Counsel, let me ask you a question. This was an extensive hearing in aggravation and mitigation, correct? Yes. And his lawyer fought like crazy to get the best sentence possible for his client. Wouldn't you agree? Yes. Okay. All the factors that you say are present, you know, the research says are applicable to juveniles. If it pertained to this defendant, don't you think that his lawyer would have brought forth evidence of that? Well, the factors that I'm bringing forth were brought forth by the lawyer. But my point is that the trial judge dismissed it, did not take it into consideration. How can you say that when the trial judge had an extensive hearing, made extensive comments, and just rejected those arguments, okay? It's not that he didn't consider them, he didn't accept them. And that's certainly within the discretion of the sentencing court, would you not agree? The court does have discretion, but if there is evidence of rehabilitative potential, the judge cannot ignore it, has to give that some weight. And that is all I'm saying in this case. What are you pointing to to say that the judge did not give it some weight? He may have given it the weight he felt it was entitled to, and then reached a decision he reached. Your argument is basically no 17 year old should ever get a life sentence. That's your argument. And that's not what Miller says, and that's not what Holman says, and that's not what Buffer says. You know, it's up to the trial judge to consider these factors and then make a decision. I don't see anything in this record that says judge or that indicates that Judge Lenihan didn't give this defendant every opportunity to make a case, gave his lawyer an opportunity to make his case. And I have to think that the performance of this defense lawyer would indicate to me that had there been evidence supporting your Miller type arguments, it would have been presented to the court. Yes, thank you. I'm not saying that no 17 year old convicted of murder should get a life sentence. I'm saying that Montgomery versus Louisiana says that sentencing a juvenile to a natural life sentence is excessive for all but the rare children whose crimes reflect irreparable corruption and permanent incorrigibility. And so I'm just saying my client is not one of those rare clients for the reasons explained in the briefs. And the reason why the reason why I am arguing that the judge abuses discretion here is because of the way the ways that the judge went out of his way to discount evidence they shouldn't have. For instance, let me give another example. There was evidence that Wyma was abused emotionally, verbally, and physically. Wyma said that his father threw him up against a wall when he was five years old. Wyma's sister at sentencing said, yeah, growing up I heard that story about Wyma being thrown up against a wall. At sentencing, in pronouncement of sentence, the judge stated that Wyma's siblings flatly denied that Wyma was ever abused and that was incorrect. Wyma's brother was not asked about the abuse and Wyma's sister corroborated it to an extent. So the judge, that's just another instance of the judge going out of its way to discount anything, you know, mitigating. And the state did not dispute that in its brief that the judge misrecalled that evidence, you know, in favor of the state when that was inaccurate. The siblings did not deny that he was abused. And even if he was only verbally and emotionally abused, the juvenile mitigating factors say that childhood trauma and physical abuse are both mitigating factors. So mental and verbal abuse is no less mitigating. And so, your honors, I just argue that the rehabilitative potential was here because of his education, his lack of priors, his remorse, and all of the things explained in the record. The lack of there being any type of evidence that his condition is permanent, that he will reoffend or anything like that, your honors. And if you have no further questions, I'd ask for a new trial or new sentencing hearing and the alternative. Thank you very much. We really appreciate it. You both have done an excellent job both on argument and in the briefs. And you'll be hearing from us soon. Thank you.